Our next case will be CaesarsEntertainmentCorpvInternationalUnionofOperatingEngineersNumber18-2465. Whenever you're ready. May it please the court, my name is Michael Scaraggi. I represent the appellant, the local 68 Engineers Pension Fund. I would like to reserve five minutes for rebuttal. That will be granted with the permission of the court. Your Honors, the facts in this case are uncontroverted between the parties. The facts involve the operations of four casinos in Atlantic City, New Jersey. Showboat, Valleys, Caesars, and Harris Casinos. Each of those casinos is covered under a collective bargaining agreement with the local 68 Engineers Union. And in each of those collective bargaining agreements, the description between the local 68 Engineers Union identifies the party with whom they have that collective bargaining agreement. Isn't there a dispute over what the jurisdiction actually is? Whether it's just the individual house or entirely Atlantic City? Yes, Your Honor. We contend that there is no question with respect to the jurisdiction for a number of reasons. Number one, the collective bargaining agreement specifically described each casino with the jurisdiction as Atlantic City. Valleys, Atlantic City. Harris, Atlantic City. Caesars, Atlantic City. Does it say that's the jurisdiction or you're just saying? Yes, Your Honor. There's a recognition clause in each collective bargaining agreement wherein the union is recognized as having the jurisdiction of Atlantic City, New Jersey with that casino. So as far as we're concerned, each collective bargaining agreement identifies Atlantic City. There's a recognition in each collective bargaining agreement which identifies Atlantic City. In each collective bargaining agreement, it describes the exact work that's being performed by the operating engineer at each of those particular sites. So as far as we're concerned, there's no dispute with regarding the jurisdiction. Jurisdiction is clear. Geographic as well as trade, it's clear. And the jurisdiction of the engineers, the union itself, is statewide. It's not confined only to Atlantic City. It is statewide. But with respect to the facts of this case, it's absolutely confined to Atlantic City as so identified in each collective bargaining agreement. All right. Let's change up the facts of this case a little bit. Instead of four different casinos, let's assume that the engineers are at two casinos. And let's assume there are 500 engineers total, 250 at each casino. One casino closes and they build up the operations at the other casino. So they take 250 workers from one and move them. So now instead of 250, 250, there's 500 over here. Is that a partial withdrawal? That could constitute either a partial withdrawal or a complete withdrawal. My contention is that it would constitute a partial withdrawal. That seems nonsensical because under my hypothetical, there are still 500 operating engineers. And Caesars, or the operator, would still be paying benefits on all 500 engineers. Notwithstanding the fact that they're paying benefits on all 500 engineers, if the contributions dip below 70% total at the end of the fiscal year for which the first casino is closed or shutters, that would constitute a partial cessation of operations under the statute. Even though under my hypothetical, Caesars is paying 100%, the exact same amount of money in the next calendar year than they paid in the previous calendar year. Yes. So they're going to suffer a penalty under the Multi-Employer Act, even though they're paying 100 cents on the dollar. They're going to have to pay a legal penalty. It would still be a partial withdrawal. In this case, it was a 17% reduction in contributions. It could have been a 67% reduction in contributions. It never reached the level of a 70% reduction in contributions. Had it reached the level of a 70% reduction in the level of contributions, that in and of itself would have been a partial cessation of operations, a partial termination. I'm sorry, Judge? What are these benefits paid on? Is it per capita or is it based on a percentage of the salary of the employer? Based on hours worked, Judge. Hours worked. Based on hours worked. We contend that section 4205B2A subsection I, there's also a subsection 2I, is what governs in this case. There is a partial cessation of the employer's contribution obligation for the planned year if during such year the employer permanently ceases to have an obligation to contribute under one showboat or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform the work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. And that last phrase, previously required, previously required at the showboat, at the closed operation. That is our contention as to what that language refers to. Now, the ‑‑ Can I have you, your time is running out quickly here. The PBGC issued a couple of letters that could be relevant here. In particular, March 30th, 1992 and September 2nd, 1983. What kind of deference do we pay to these types of letters? It's not Chevron deference, right? It's deference to an agency of the government, the Pension Benefit Guarantee Corporation. It's not binding on this court. It is interpretive. It gives guidance. But it's not authoritative. And the court below relied upon PBGC opinion 83‑20, which was made on September 2nd, 1983. And that PBGC opinion, when it's read in full context, can be interpreted either way. It could be interpreted for the appellee or it could be interpreted for the appellant. We contend, and the arbitrator referred to that PBGC opinion as well, that it applied to the appellant and it constituted and provided language that supported a partial withdrawal. The other PBGC opinion I think your Honor referred to was March 30th, 1992. I'm sorry, I didn't write down the number. March 30th of 1992 was a PBGC opinion which also dealt with the issue of partial cessation of a control group. A control group's contribution obligation. And it referred to four employers, one of whom pulled out. But it really was not a closing of the facility. It was a sale of the facility. Three other facilities continued to operate and continued to make contributions. Similar to this case. But there was qualification language in that PBGC opinion 92-1 which referred to the sale of the assets. Now, in this case, there was no sale of assets. In this case, there was no transfer of work from one jurisdiction to another jurisdiction. There was no shifting of work from one casino to another casino. There's no, nothing like that in that nature took place. How would it be if they had sold this one casino instead of just closing it? How would that affect it? I'm sorry, Judge, the question was? How would it affect it if they just sold that casino instead of closing it down? Well, if they sold the casino, then another section of the MEPA provisions would have engaged as to whether or not the successor employer would have been willing to post a bond as to what the total contributions were from that casino, whether or not the pension fund would waive the posting of a bond. A whole other set of regulations then would have engaged if there was a sale of that casino. So subsection I deals with a bargaining unit takeout. Subsection II deals with a facility takeout. We're talking about not at issue here. This is not at issue. We contend it is not at issue. We also contend this. I see my time has expired. The last comment is good. OK, my last comment is this. If if the facts of this case don't apply to subsection I, very unique, unique facts. I can't think of a case. And I've been thinking about this for a long time. Why we would even need a subsection I. To the MEPA statute. Thank you. Good afternoon. May it please the court. My name is James Tice. I'm appearing on behalf of plaintiff appellee CEC. The MPPAA or MEPA provides that an employer partially withdraws from multi-employer pension plan in two general circumstances. The first is where the magnitude of contribution decline over a three-year period is so great due to a facility closure or the like that it triggers a per se withdrawal. The so-called 70 percent rule. It's undisputed between the parties. That's not what's happening here. 17 percent. It's only 17 percent. So less than a quarter of that per se trigger. The other circumstance is where an employer in essence evades a contribution obligation by substituting covered work. That is work for which contributions are currently required for work of the type for which contributions were previously required. Such as when a union decertifies at a certain facility or negotiates out of a contribution obligation during collective bargaining. So to answer my friend's, the last thing he said in the end, those are the types of circumstance where subsection I does apply. It is certainly not meaningless under our view. Quite the contrary. But it is again undisputed that nothing like that happened in this situation here either. Instead, all agree that Showboat closed for business reasons and that CEC continues to contribute for all work it continues to do. You know, it's interesting. Your adversary points out kind of if your argument is run out to its conclusion, if everyone heads for the exits, aren't the employees going to be in bad shape then? No, Your Honor. And that's because of the 70 percent rule. And I think it's important to get a good sense of how that rule operates because it shows exactly why that's never going to happen. And the reason is, and I can get into the very, very technical details if you like. But at a high level, it says once contributions decrease 70 percent, it has to be over a three-year period. And then it's comparing that three-year period, it's comparing to the prior five years before that what the highest two, the average of the highest two years of contribution-based units, i.e. hours contributed to the plan were for those five years. So it's really looking at it on a retrospective basis over the previous eight years. And it's saying for the three-year test period, the past three years, did it dip below essentially 30 percent of the high average contributions for all three of those years? In that case, there's now a partial contribution and you owe partial withdrawal liability. So I think that really answers the concern they have. That is the exact way that Congress designed this so that you couldn't have a situation where you're slowly dribbling out of contributions. Once your contributions get to a certain point, you're then hit with partial withdrawal liability. All right, let me just push you a little farther on that because what I hear you saying is that if they close three of the four facilities, presuming that there's this equal number of hours worked at all four, that would trigger the 70 percent rule because three out of four is 75 percent. Assuming that the contribution-based units add up to 70 percent for those casinos. Okay, so is this just a weakness in the statute then that it looks like if Caesar's intent, I don't know whether it was or not, but if Caesar's intent were to stop having to contribute to this plan, it seems like they could structure it by closing one of the four this year and wait a year or two and close the next one and then close the third one. You see what I'm saying? If they close three out of four today, that's over 70 percent. You lose. They win. But if you do it in a staggered way, you haven't accomplished the same thing as quickly, but you've accomplished the same goal over time. Does the statute allow you to do that? Not really, Your Honor. And again, it goes to kind of the eight-year retrospective period. I have a couple of responses. First of all, just again, this is the way Congress understands that some industries are declining and facilities might close. So they looked back at this eight-year period to try to figure out how are you going to figure out whether they've reduced their contributions enough for the partial withdrawal liability to kick in. So technically, it might be able to do what you said, but it would have to be done over a really long period of time, like 10 years. So I think to evade, that would just be a very complicated thing to do. But I think the other point is that as a practical matter, a lot more goes into deciding whether a casino is going to close than whether or not it's going to have to make contributions. It would seem to be very odd, I think, for an employer to structure its operations to close casinos over a 12-year period or something in order to avoid some partial withdrawal liability. Are there any appellate cases on this? The closest one we could find, Your Honor, is the Nestle case, and that involves a transfer. So it's the same provision we're talking about here. It's 1385B2A1. Facts are different, right? Facts are a little bit different, but it's the closest thing we could find. And that essentially confirmed that, you know, it read the same language and said, clearly, we're looking for a situation where work is being continued or transferred without the contributions being made. So we think that lends support to our position. We understand it's not entirely on point. And frankly, there aren't any cases on point, and we think that is a point in our favor, Your Honor, because, you know, the fact that we can't find a single case that has actually done this, what they say, if they say the language is as clear as it is, it's not even clear that any plan has even tried to do this, at least not that's been adjudicated in the federal court or resulted in a holding. So we think that if it's really the case that every time an employer closes a facility in the same jurisdiction where it's continuing to do work, you're going to get partial withdrawal. This would have come up more often. But the fact that it hasn't, we think, makes a lot of sense, because the PBGC, which is the expert agency charged with the statute, has looked at this language over many years. It has a consistent position. The legislative history is clear. And, you know, given those factors, I do want to make one point about the PBGC opinion letter, because I think that... Yeah, do you need that to win the case? No, I don't think so, Your Honor. I think we can win on the text alone, and I'm happy to walk through exactly why I think the text helped. I just think that illuminates this. It goes to show... You went on text or on structure, because previously required has some inherent ambiguity in it, doesn't it? I don't think that is necessarily ambiguous. I think it's more, it just doesn't 100 percent answer the question. It's not totally precise on this point. I think the strong implication of we're previously required is suggesting you had an obligation to contribute. You ceased that obligation to contribute, but you're still doing the work you were previously required to receive contributions for. In that sense, it really sounds like it's talking about you're not required to contribute, you know, were previously required, but you're also just not making the contributions. That's a strong implication, and I think that's supported by a few things. One, I don't think the other side would even disagree that the heartland of this provision, this 1385B2A1 or Romanet I, is a situation where, just what I said, an employer has an obligation, it's ceased, but it keeps doing the same work in the same place. Such as when, you know, if the employer negotiated with the union to start making 401K contributions rather than CBA contributions, for example. So it's no longer contributing to the plan for the same work. Or it moves the work from the shed out into the field. Exactly. That's another good example. So I think that's kind of the heartland of the situation. So I think that accords with the kind of common sense reading. But I think there's a bunch of textual cues that support our reading as well. I think the transfers in that same Romanet, I think, really supports us. Because in that case it says, you know, if the employer either continues work of the type which previously required contributions, or if it transfers such work, so it's the same type of work, in either way you have a partial withdrawal. And I think my friend on the other side said that in a situation where you transfer work from one facility to another, you keep making all the contributions. There's no decline in contributions in that circumstance. That still counts as a partial withdrawal. That can't be right. It would mean that transferring work from one casino, from Showboat to Harris, all those employees, just moving them over, making a super casino, that combined the two, that counts as a cessation and a withdrawal. And we'd be potentially assessed partial withdrawal liability for that. We just don't think that makes any sense. And we think that there's a few other locations that do the same sort of thing. But that's more of a structural than a textual. I guess it's a little bit text, a little bit structure. Right, right. I mean, I think there's another textual point that really helps us too, Your Honor, and that's 1383B2. That's the construction industry provision. And the reason why I like it, if you have your My Brief in front of you, it's addendum pages six and seven. It's really at the top of addendum page seven. And I think the key is that it's talking about partial withdrawal in the construction industry. And as you may or may not know, MEPA has certain rules for different industries. But the key here is that it uses the identical language, continues to perform work of the type for which contributions were previously required. But it does the same thing as the transfers provision does, and the provision we were just talking about in the Romanet I provision. So first, it uses that same language, continues to perform work in the jurisdiction of the type for which contributions were previously required. But then the next provision talks about how you can, there's also withdrawal liability if the same employer resumes such work without renewing the obligation to contribute at the time of the resumption. So again, it's referring to the work again. I want to be very clear about this because it's referring to the same type of work, work of the type for which contributions were previously required. That contribution then must be resumed, which again, suggests that when Congress was talking about were previously required, it was really thinking were previously required and are no longer making contributions. And I want to also point out too, in addition to the anomaly, my friend discussed with your honors regarding the transferring work for which contributions continue to be made. There's some other kind of strange anomalies under their reading too, which I think really go to show, again, this is kind of more of a structural point or maybe a policy point, but it goes to show this, that our reading is by far the better one. And it is, it's a situation where, for example, I think we talked about the Ventnor City example, where you have one hotel, showboat in Atlantic City, one hotel in Ventnor City. If you close the showboat facility, even under their view of partial withdrawal liability, there's no partial withdrawal in that circumstance because no work is being continued in the same jurisdiction. We don't think that makes any sense. Why would Congress, it's the same effect on the plan. Why would Congress have done that? But I can put an even finer point on that example. Say that there are the four casinos at issue here. There's Harris, Caesars, Bally's, and showboat in Atlantic City. And then there's another casino in Ventnor City. Now, if showboat closes by itself under their view of the partial withdrawal liability statute, that is a partial withdrawal because work from the other three casinos will continue in Atlantic City. But if all four of the casinos closed in Atlantic City, that would not constitute a partial withdrawal under their view, even though that is clearly worse for the plan, it's worse for the participants, and it's worse for the beneficiaries. Wouldn't that trigger the 70% rule? It might, Your Honor, but I'm just trying to have an example that goes to show exactly why it's arbitrary to say that it should, whether or not there's a partial withdrawal, should arbitrarily depend on essentially how broadly the parties have defined the jurisdiction or whether the employer just happens to be doing work in the same jurisdiction versus a completely different jurisdiction. So what are the parameters of jurisdiction then here? The parameters of the jurisdiction, Your Honor, I think, you know, can be, actually to go to your first question before, Your Honor, I'll get to your question one second if you don't mind, but you had asked earlier whether that's a question of law or of fact. We think it's a question of law, Your Honor, and in their brief state it suggested there are no disputed issues of fact.  a contract interpretation, at least when you're looking at extrinsic evidence or trying to discern parole evidence, things like that, that's usually a question of law. So we think that can be decided by this court. To the extent there's any doubt about that, I think there would have to be a remand to the extent the court decided to reach this issue, which it wouldn't need to to simply affirm the district court. But I think just our basic point about the jurisdiction is you can look at the four corners. It doesn't make a lot of sense to say, to have a CBA where all the work is going to be performed at a single casino in a single place in Atlantic City to really be considered the jurisdiction of all of Atlantic City. And I think my friend on the other side pointed to the recognition clause. What that clause says is employer recognizes the union as the sole and exclusive collective bargaining representative of the following employees employed by the employer in Atlantic City, New Jersey, and the employer is defined as a specific casino at a specific place. On A66 it talks about the work that's going to be performed. That's the second page of the CBA. It says that work is reconstruction, maintenance, renovation, alteration, rehabilitation of hotel and its facilities and appurtenances. So it's talking about the jurisdiction of that CBA is talking about the work that's going to be performed at the casino. And I'll give you one more clause too because we didn't cite it in our brief, but I thought it was useful because I think it kind of proves our point. It's on page 882. It's in the general conditions. And what it says is it's paragraph five. It says trade employees may be assigned to work at other properties owned and operated by their parent company if parent company owns or operates more than one property in Atlantic City. Now if the jurisdiction of this provision were all of Atlantic City, you wouldn't need a provision like that because by necessity you wouldn't be able to work anywhere in Atlantic City. You wouldn't need a special provision saying you can work outside the jurisdiction. So for all those reasons we just think if you look at just the four corners, that's another way to resolve this case in our favor because we don't get to jurisdiction if we're with you on the merits. That's right. There would be no need to do it, Your Honor. I just want to make one more point too. Obviously if the court has any questions I'm happy to answer them, but I wanted to make one more point. I think my friend on the other side said it's debatable. Maybe it could go either way, the two PBGC opinions. I don't think it could have been much clearer. The 8320 opinion in particular, it's on page A188 of the appendix. It's virtually identical facts. They're talking about two facilities each requiring contributions and the work is transferred from one to the other. And what PBGC says is it is the PBGC's view that for this provision to apply, the work that the employer continues to perform must be work for which contributions are not required under the plan. Now again, we don't think we need this to win, but we do think that all the tools of statutory construction are pointing in the same direction. The text, the consequences, the structure, and then the official guidance, legislative history, and then also the official guidance from the expert agency charged with administering it. I will say that this provision is signed by, or these letters are signed by the general counsel. This particular letter was issued just a couple years after MEPA was enacted and MEPA was enacted in response to a report commissioned by Congress that the PBGC issued in order to essentially talk about how best to save the pension system. So anyway, for all these reasons, I think that the district court got it exactly right and that this court can affirm. No further questions? Okay. Thank you, counsel. Thank you very much. Just a few points, your honors. I'd like the court to refer to PBGC opinion 8717, which was rendered on August the 13th, 1986, which dealt with the transfer of work. Now, we're not contending that work was transferred from the showboat. Is that in the record? I can't remember. Is that in the record or did you pick that up in Westlaw? PBGC? Yeah, 8717. 8717. It's not 8617? 8717 I have. Okay. I have 8717, 1986. It deals with the transfer of work and there was a definition in there of partial cessation. A partial cessation occurs under subsection I1. Contributions cease in a collective bargaining agreement and either of two circumstances occur. Either one of two. First one, the employer continues to perform the same type of work within the agreement's jurisdiction. We contend that applies. Now, with respect to jurisdiction. I'm sorry, counsel. Is that the food company one where they replaced the CBA-covered warehouse with third-party wholesalers? No, I don't think so, Your Honor. A different one? No. The question of jurisdiction, I think, is clear. Each collective bargaining agreement specifically identifies, for example, Cesar's Atlantic City, Valley's Atlantic City.  contains identical language describing the work jurisdiction that is going to be performed. Maintenance, Atlantic City, New Jersey. Each collective bargaining agreement contains an Article I, which is a recognition clause which specifically states, and my friend referred to it, employer recognizes the union as the sole and exclusive collective bargaining representative of the following employees employed by the employer in Atlantic City, New Jersey. Each of those four collective bargaining agreements describe that. The last point I want to make is what I call the last standing argument. If the court were to affirm the judgment in order of the court below and Showboat withdraws and there is no partial withdrawal, a year or two years later, Valley's could withdraw. There would be no partial withdrawal. A year or two years later, Harris could withdraw. There would be no withdrawal liability. A year or two years later, Cesar's could cease all operations, file a petition in bankruptcy. There would be no withdrawal liability. Well, when the last one closes, they're going to trigger the 70% rule because that's 100%, right? But they could close three of the four. That was the concern I was asking. Absolutely, they could close the three. But his rejoinder was, well, it's baked into the statute that it's going to be, it's going to take a while. Did you agree with his timeline about the eight-year look back? That it's an average, it's not just, you don't just take a snapshot at the time one casino closes to determine whether the 70% rule is triggered. No, the snapshot has to be taken at the time the casino closes. Without reference to how much they were contributing to the plan? That is the reference point, is the total amount of contributions that were being made at that time at the end of that last fiscal year at the time that that casino closed to trigger the 70% rule. What happened two years ago or five years ago is immaterial? It's immaterial. It's immaterial. So those casinos could close. There would be no withdrawal liability. The United States Code 1001-EDSEC, PBGC, the purpose of the statute is to protect the money to be there so that when these participants come up to the window to collect their retirement benefit, it's going to be there. I thought that was the purpose, but when I asked you, I was astounded by your answer. I gave you a hypothetical where they move, they consolidate two locations in one, and the same amount of hours are worked, and they're paying 100 cents on the dollar, and your answer is this law hits them with a penalty. That was your answer. Is that still your answer? That's still my answer. I find that hard to just, I don't know what they think, but I find that hard to swallow because I thought the statute was about protecting the union workers from diminished contributions, not 100 cents on the dollar contributions. Well, with respect to 100 cents on the dollar contributions, I understand the court's argument in that respect. The likelihood of that happening, likelihood, is unlikely that it would occur. The likelihood of the casinos closing one at a time, that's much more likely. There's no question about that. We could not find any case on point with regard to the facts of this situation, and we think that this statute is the statute that applies. Your time's up, counsel. Thank you. Thank you, Judge. We thank counsel for the excellent briefing and oral argument. We take the case under advisement, and we'd also like to thank counsel at sidebar.